Virginia Ann CALLAN, Charles Oliver Richardson, III

v.

G.D. SEARLE & COMPANY, Searle Pharmaceuticals, Inc.

Civ. No. B–87–1312.

United States District Court, D. Maryland.

March 27, 1989.

**WALTER E. BLACK,** Jr., District Judge.

Pending before the Court is defendants' Motion for Summary Judgment based upon federal preemption of state tort law. After careful review, the Court denies the motion.

Under Rule 56 of the Federal Rules of Civil Procedure, a motion for summary judgment shall be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

The underlying facts are not in dispute in this motion but are summarized briefly to put the legal issues in context. Plaintiff [1] alleges that her use of a Cu–7 ("Copper 7") intrauterine device (IUD), which was developed, manufactured and promoted by defendants [2], caused her to suffer pelvic inflammatory disease, severe damage to her reproductive organs, and infertility. As a result of these injuries, plaintiffs also claim loss of consortium. Plaintiff alleges that she bought and was inserted with a copper-based IUD on three separate occasions for the purposes of temporary contraception and that each IUD was developed, manufactured, and promoted by one or both defendants. Plaintiff claims she was never informed of the risk of pelvic inflammatory disease or infertility. The first two IUDs, a Cu–T and a Cu–7, were inserted and removed at three-year intervals according to the manufacturer's instructions. On the third occasion in 1979, plaintiff was inserted with a Cu–7 IUD, and a year later began experiencing heavier and longer menstrual periods with severe cramping. That same year, the Cu–7 string withdrew into her uterus and, after the physician located the IUD by ultrasound, plaintiff requested that it be removed. Plaintiff eventually discontinued use of contraception in order to become pregnant. In 1984, plaintiff was hos-

H. Robert Erwin, Jr., Pretl & Erwin, Baltimore, Md., for plaintiffs.

Paul F. Strain, James L. Shea, Elizabeth C. Honeywell, W. Warren Hamel, Baltimore, Md., for defendants.

1. Both Virginia Ann Callan and her husband, Charles Oliver Richardson, III, are named plaintiffs in this action. Any reference to a single plaintiff should be construed to mean Virginia Ann Callan unless otherwise specified.

2. Plaintiff's complaint alleges that the Cu–7 IUD was developed, manufactured and promoted by defendant G.D. Searle & Company, and/or by its subsidiary, defendant Searle Pharmaceuticals, Inc.

pitalized and diagnosed as having probable chronic pelvic inflammatory disease. In subsequent years, she was treated for injuries to her reproductive organs. Plaintiffs' complaint comprises theories of liability based on negligence, strict liability, fraudulent misrepresentation and breach of warranty.

■ It is the position of defendants that state tort law liability is preempted by the Federal Food, Drug and Cosmetic Act of 1938 (FDCA), 21 U.S.C. §§ 301, *et seq.*, and by the 1976 Medical Device Amendments to the FDCA, 21 U.S.C. §§ 360c, *et seq.*

The Court directs its attention first to the FDCA. Defendants assert that because the Food and Drug Administration (FDA) approved the Cu–7 IUD for marketing in 1974 as a prescription drug under the FDCA and approved the warning label to accompany the product, state tort law is effectively preempted. In particular, defendants note that the FDA conducted clinical trials relating to pelvic inflammatory disease before approving the Cu–7 IUD, and insist that it would be impermissible for a jury to determine that the product was unreasonably dangerous, that it was unreasonable to place the product on the market, or that the warning was inadequate.

In *Abbot by Abbot v. American Cyanamid Co.*, 844 F.2d 1108 (4th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988), the Fourth Circuit considered whether the Federal Food, Drug and Cosmetic Act preempted state common law liability for defective design or failure to warn against a manufacturer of a vaccine, and concluded that "Congress did not intend, either expressly or impliedly, to preempt state law," *Id.* at 1111. In that decision, the Court succinctly stated the law on federal preemption as follows:

The doctrine of federal preemption of state law arises under the supremacy clause of the United States Constitution, art. VI, cl. 2. Preemption occurs in any of three manners: (1) Congress may pass a statute that by its express terms preempts state law, (2) Congress, though not expressly so stating, may imply that it is preempting state law by occupation of an entire field of regulation, so that no room is left for supplementary state regulation, (3) Congress may speak neither expressly nor impliedly of preemption, nonetheless state law is preempted to the extent it actually conflicts with federal law; such a conflict occurs when (a) compliance with both state and federal law is impossible or (b) when state law stands as an impediment to a federal purpose.

*Id.* Defendants concede that the *Abbot* decision holds that in enacting the FDCA, Congress did not expressly preempt state tort law and did not impliedly preempt state law by occupying the entire field of regulation. Defendants' principal argument has been that the Fourth Circuit in *Abbot* had not decided the question of whether the FDCA actually conflicts with state tort law. The Court disagrees but finds in any case that state tort law is not preempted through an actual conflict with FDA regulation.

In *Abbot*, the Court specifically rejected defendants' "narrow preemption" argument that national public health purposes would be frustrated by state tort law liability. *Id.* at 1113–14. Noting the competing goals of product safety, which is enhanced by state tort law, and product availability and use, which can be frustrated by state law, the Court stated that the main issue was whether federal regulations had struck the balance between safety and quantity or merely established minimum safety standards. The Court concluded that as to vaccines, federal regulations promulgated pursuant to the FDCA served only as minimum standards. The Court cited *Hillsborough County, Florida v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 721, 105 S.Ct. 2371, 2379, 85 L.Ed.2d 714 (1985), where the Supreme Court found that in regulating the collection of blood plasma, neither Congress nor the FDA had struck a particular balance between safety and quantity, but instead had merely established minimum safety standards. In *Kociemba v. G.D. Searle & Co.*, 680 F.Supp. 1293, 1299 (D.Minn.1988), the Court rejected an identical preemption claim involving

the Cu–7 IUD and noted the widely held view that FDA regulation of prescription drugs establishes minimum standards both as to design and warning. This Court finds that FDA approval of the design and warnings for the Cu–7 IUD provided minimum standards and thus would not necessarily conflict with a jury determination that the product was unreasonably dangerous, that defendants were unreasonable in marketing the product, or that the warnings were inadequate. Compliance with state and federal law is not impossible. This is particularly true where plaintiffs allege, as they do here, that defendants misrepresented or withheld relevant data concerning the Cu–7 IUD and pelvic inflammatory disease, causing the FDA to base its decisions on erroneous or incomplete information.

Like the Court in *Kociemba*, this Court is also persuaded by the Supreme Court's ruling in *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984), which held that an award of punitive damages against the manufacturer of plutonium products did not conflict with federal law regulating the nuclear energy industry. The Court found that the tort judgment was not precluded by federal law despite the ruling in *Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Comm'n*, 461 U.S. 190, 211–13, 103 S.Ct. 1713, 1726–27, 75 L.Ed.2d 752 (1983), that States are precluded from regulating the safety aspects of nuclear energy. The Court stated:

> No doubt there is tension between the conclusion that safety regulation is the exclusive concern of the federal law and the conclusion that a State may nevertheless award damages based on its own law of liability. But as we understand what was done over the years in the legislation concerning nuclear energy, Congress intended to stand by both concepts and to tolerate whatever tension there was between them. We can do no less. It may be that the award of damages based on the state law of negligence or strict liability is regulatory in the sense that a nuclear plant will be threatened with damages liability if it

does not conform to state standards, but that regulatory consequence was something that Congress was quite willing to accept.

*Id.* at 256, 104 S.Ct. at 625. Thus, the Supreme Court in *Silkwood* made it clear that Congressional intent is important in determining whether federal preemption might exist where there is tension between federal and state law. The Supreme Court found no indication that Congress intended to preclude state tort remedies in the Atomic Energy Act of 1954 as enacted or as amended in 1959. The Court stated: "This silence takes on added significance in light of Congress' failure to provide any federal remedy for persons injured by such conduct. It is difficult to believe that Congress, would, without comment, remove all means of judicial recourse for those injured by illegal conduct." *Id.* at 251, 104 S.Ct. at 623. FDA regulation of the Cu–7 IUD presents less of a conflict between state and federal law than regulation of nuclear energy by the Nuclear Regulatory Commission; in *Abbot*, the Court found that an analysis of later vaccine legislation indicated that Congress had assumed that state civil actions were available under the FDCA. 844 F.2d at 1113–14. Furthermore, unlike in *Silkwood*, Congress in enacting the FDCA did not impliedly preempt state law by occupying the entire field of regulation in terms of product safety. And finally, as in *Silkwood*, Congress failed to provide any federal remedy for persons injured by illegal conduct.

For all of these reasons, the Court finds that FDA approval of the design and warnings for the Cu–7 IUD pursuant to the FDCA does not preempt state tort law.

■ The Court now turns to defendants' contention that the 1976 Medical Device Amendments to the FDCA apply to the Cu–7 IUD and expressly preempt state tort law. The Court finds that the Cu–7 IUD is not subject to the Medical Device Amendments, because under the FDCA it is regulated as a prescription drug; however, even if the Device Amendments applied, the Court finds that the language and legislative history of the "supremacy" provision,

21 U.S.C. § 360k, indicate that Congress did not intend to preempt state tort law.

In *Kociemba v. G.D. Searle & Co.*, 680 F.Supp. 1293, 1295 (D.Minn.1988), the Court recounted the history of Cu–7's classification under the FDCA. G.D. Searle & Company decided to market the Cu–7 in the United States in 1970. At that time, the FDA had considered all IUDs, including Cu–7, as medical devices for which pre-market clinical testing was not required. In *U.S. v. An Article of Drug ... Bacto–Unidisk ...*, 394 U.S. 784, 89 S.Ct. 1410, 22 L.Ed.2d 726 (1969), the Supreme Court interpreted the definition of drug broadly under the FDCA permitting the FDA to regulate an antibiotic sensitivity disc as a drug. In 1971, the FDA decided to reclassify all medical devices incorporating heavy metals as prescription drugs under 21 C.F.R. § 310.502. 21 C.F.R. § 310.502(a)(1) classifies IUDs that incorporate heavy metals or other active substances as prescription drugs. This subsection acknowledges that the efficacy of these IUDs is correlated to local irritation, but also notes that investigators had found that different pregnancy rates appeared to be dependent on the type of metal used and/or the amount of exposed surface of metal. 21 C.F.R. § 310.502(a)(2) indicates that IUDs used for the purpose of contraception and incorporating heavy metals or other active substances to increase the contraceptive effect, to decrease adverse reactions, or to provide increased medical acceptability, are to be classified as new drugs subject to clinical investigations and pre-market approval by the FDA. Defendants concede that this regulation covers the copper-based Cu–7 IUD, and that in 1974, the FDA approved the Cu–7 IUD as a prescription drug for sale and distribution in accordance with the FDCA and 21 C.F.R. § 310.502.

In support of the FDA's classification, the Court finds significant Searle's label for the Cu–7 IUD, which was approved by the FDA on February 25, 1974, and which describes the "action" of the IUD as follows:

Available data indicate that the contraceptive effectiveness of the Cu–7 is enhanced by a minute quantity of copper being released continuously from the copper coil into the uterine cavity.

Also, a Three–Year Efficacy and Safety Review of the Cu–7 by the FDA dated December 2, 1976, states: "The contraceptive activity of the Cu–7 is believed to depend in part primarily on release of copper ions into the uterus." In the 1976 Medical Device Amendments, Congress defined the term "device" as an instrument "which does not achieve any of its principal intended purposes through chemical action within or on the body of man ... and which is not dependent upon being metabolized for the achievement of any of its principal intended purposes." 21 U.S.C. § 321(h). The FDA found that the Cu–7 IUD does achieve its principal intended purpose of contraception in part through the release of copper ions into the uterus. The term "drug," as defined by Congress in the FDCA, "does not include devices or their components, parts, or accessories," 21 U.S.C. § 321(g)(1), and thus the terms "drug" and "device" are mutually exclusive. During oral argument, defense counsel admitted that the FDA still treats the Cu–7 IUD as a drug and has not reclassified it as a device.

For the reasons stated above, the Court agrees with the Court in *Kociemba* and finds that the Medical Device Amendments of 1976 do not apply to the Cu–7 IUD. *See Kociemba*, 680 F.Supp. at 1298.

■ Finally, the Court addresses whether the Medical Device Amendments would preempt state tort law if they applied. 21 U.S.C. § 360k states:

**(a) General rule**

Except as provided in subsection (b) of this section, no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—

(1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and

(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement

applicable to the device under this chapter.

**(b) Exempt requirements**

Upon application of a State or a political subdivision thereof, the Secretary may, by regulation promulgated after notice and opportunity for an oral hearing, exempt from subsection (a) of this section, under such conditions as may be prescribed in such regulation, a requirement of such State or political subdivision applicable to a device intended for human use if—

(1) the requirement is more stringent than a requirement under this chapter which would be applicable to the device if an exemption were not in effect under the subsection; or

(2) the requirement—

(A) is required by compelling local conditions, and

(B) compliance with the requirement would not cause the device to be in violation of any applicable requirement under this chapter.

In adopting implementing regulations for this section, the FDA encompassed any requirement having the force and effect of law, whether established by statute, ordinance, regulation, or court decision. 21 C.F.R. § 808.1(b).

Defendants assert that § 360k and the FDA's implementing regulation expressly preempt state tort law. The Court disagrees. The plain language of § 360k indicates that Congress intended to preempt state or local legislation and administrative regulations governing devices, not state tort law. The common law is never mentioned, and there is no provision of a federal remedy for those wrongfully injured by the devices. As the Supreme Court stated in *Silkwood*, "(i)t is difficult to believe that Congress, would, without comment, remove all means of judicial recourse for those injured by illegal conduct." 464 U.S. at 251, 104 S.Ct. at 623. In addition, if the term "requirement" were interpreted so as to include tort law, the exemption procedures would be rendered absurd; is the State supposed to petition the Secretary of Health and Human Services after every verdict in favor of an IUD tort plaintiff?

The legislative history of § 360k further supports the view that Congress did not intend to preempt state tort law. In a report by the House Committee on Interstate and Foreign Commerce, this "supremacy" provision is specifically discussed and establishes that Congress intended the term requirement to refer to legislative and administrative "programs" governing the sale and distribution of devices, not to state common law. House Report No. 94–853, 94th Congress 2d Session, pp. 45–6. Pertinent excerpts from the House Report read as follows:

The Committee recognizes that if a substantial number of differing requirements applicable to a medical device are imposed by jurisdictions other than the Federal government, interstate commerce would be unduly burdened. For this reason, the reported bill contains special provisions ... governing regulation of devices by States and localities....

In the absence of effective Federal regulation of medical devices, some States have established their own programs. The most comprehensive State regulation, of which the Committee is aware is that of California, which in 1970 adopted the Sherman Food, Drug, and Cosmetic Law. This law requires premarket approval of all new medical devices, requires compliance of device manufacturers with good manufacturing practices and authorizes inspection of establishments which manufacture devices. Implementation of the Sherman Law has resulted in the requirement that intrauterine devices are subject to premarket clearance in California.

Because there are some situations in which regulation of devices by States and localities would constitute a useful supplement to Federal regulation, the reported bill authorizes a State or political subdivision thereof to petition the Secretary for exemptions from the bill's general prohibition on non-Federal regulation....

In the Committee's view, requirements imposed under the California statute serve as an example of requirements that the Secretary should authorize to be continued....

The House Report demonstrates a clear concern with statutory programs administered by States and localities and never even hints to inclusion of state common law.

Case law supports this interpretation of § 360k and the term "requirement." In *Ferebee v. Chevron Chemical Co.,* 736 F.2d 1529 (D.C.Cir.), *cert. denied,* 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984), the Court held that the term "requirement" in a similar provision in the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136 *et seq.* (1982) ("FIFRA"), did not preempt state tort law. That provision precluded a state from imposing any requirements for the labeling of paraquat in addition to or different from those required in the relevant subchapter of FIFRA. *Id.* at 1540. Starting with the assumption that the historic police powers of the States were not to be superseded by federal law unless that was the clear and manifest purpose of Congress, *id.* at 1542 (citation omitted), the Court held that the "requirement" provision did not explicitly preempt state damage actions, but merely precluded States from directly ordering changes in labels approved by the Environmental Protection Agency. *Id.* In *Garrett v. Ford Motor Co.,* 684 F.Supp. 407, 409–10 (D.Md. 1987), the Court found that a provision in the National Traffic and Motor Vehicle Act of 1966 which prevented state or local governments from establishing or maintaining motor vehicle safety standards different from the federal standards set forth in that subchapter, 15 U.S.C. § 1392(d), did not preempt a common law claim.

For all of these reasons as well as the reasons set forth in discussing preemption under the FDCA generally, the Court finds that Congress did not intend to preempt state tort law, either expressly or impli-

edly, when it enacted the Medical Device Amendments of 1976 [3]. To the extent that the FDA's inclusion of the words "court decision" in its implementing regulations suggests otherwise, the FDA regulation contradicts Congressional intent and is not based on a permissible construction of the statute. *See National Labor Relations Board v. United Food and Commercial Workers Union, Local 23, AFL–CIO,* 484 U.S. 112, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987); *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–3, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984).

Accordingly, defendants' Motion for Summary Judgment based on federal preemption is denied, and a formal order will be entered in accordance with this opinion.

---

**3.** The Court recognizes that there are cases involving personal injuries resulting from the use of tampon devices that reach a contrary result. *See, e.g., Stewart v. International Playtex, Inc.,* 672 F.Supp. 907 (D. S.C.1987); *Edmondson v. International Playtex, Inc.,* 678 F.Supp. 1571 (N.D. Ga.1987).