[No. H012313. Sixth Dist. Sept. 15, 1995.]

LESLIE SCOTT, Plaintiff and Appellant, v.
CIBA VISION CORPORATION, Defendant and Respondent.

**COUNSEL**

Jonathan D. Gordon for Plaintiff and Appellant.

Brobeck, Phleger & Harrison, Diane S. Rice, Norma I. Loza and Thomas M. Peterson for Defendant and Respondent.

## OPINION

**BAMATTRE-MANOUKIAN, J.**—Plaintiff Leslie Scott (Scott) appeals from a summary judgment entered in favor of CIBA Vision Corporation (CIBA). CIBA manufactures and distributes a contact lens cleaning product called AOSEPT. The trial court determined that Scott's products liability claims against CIBA, based on inadequate warnings on the AOSEPT bottle, were preempted by the Medical Device Amendments to the federal Food, Drug and Cosmetic Act (the Act). (21 U.S.C. § 360c et seq.) We agree and consequently we affirm the judgment.

### STATEMENT OF FACTS

CIBA manufactures and markets a contact lens cleaning and disinfecting system for use with soft contact lenses. The product includes a cleaning solution called AOSEPT, which contains hydrogen peroxide, a lens cup and holder and a neutralizing agent. The lenses are cleaned and disinfected by placing them in the lens holder for a number of hours with the AOSEPT and the neutralizing agent. The label on the AOSEPT bottle warns the user: "DO NOT PUT AOSEPT® SOLUTION THAT HAS NOT BEEN NEUTRALIZED IN YOUR EYE." The instructions for use of the product contain similar warnings.

CIBA also manufactures and markets a sterile saline solution product, which is used as a neutralizing rinse and is compatible with eye contact. The AOSEPT and the saline solution were sold in similar plastic bottles with white tops.

On August 1, 1991, plaintiff Scott mistakenly rinsed her contact lens with the AOSEPT solution, believing it to be the saline solution. She placed the lens directly into her eye, causing eye injuries.

### STATEMENT OF THE CASE

On July 29, 1992, Scott filed a products liability complaint against CIBA, alleging that she had used the product in a manner which was reasonably foreseeable as involving a substantial danger and that adequate warnings of the danger were not given. Her complaint included causes of action for strict liability, negligence and breach of implied warranty. She claimed CIBA was aware that consumers of its product would have difficulty distinguishing between the AOSEPT bottle and the saline solution bottle when their contact lenses were removed. She alleged further that around the time of her injury CIBA had begun to market the AOSEPT solution with a red top on the

bottle, to distinguish it at a glance from the saline solution; however CIBA also continued to market the solution in the old bottle, knowing that its failure to properly warn consumers or to put distinctive markings on the bottles was causing injuries. These facts, she alleged, showed CIBA was guilty of malice, fraud and oppression, entitling her to punitive damages.

On July 9, 1993, CIBA filed a motion for summary judgment on the ground that AOSEPT was a class III medical device regulated exclusively by the Food and Drug Administration. CIBA contended that under the preemption provision of the 1976 Medical Device Amendments (the MDA), 21 United States Code section § 360k (hereafter section 360k), state claims relating to the safety of the device were preempted by the federal regulatory scheme.

The motion was fully briefed by both sides and following oral argument on August 10, 1993, the court issued a minute order, dated August 13, 1993, granting the motion. By letter to the court, counsel for Scott objected that he had not been allowed to respond at oral argument to matters raised for the first time in CIBA's reply brief. In response to the letter, the court vacated its order and scheduled further oral argument, which was held October 28, 1993.

On December 20, 1993, the court issued a second minute order granting summary judgment to CIBA on the ground that Scott's state law tort claims were preempted by the MDA. The court also denied Scott's request to continue the matter until further discovery was completed. Judgment was entered January 10, 1994.

## STANDARD OF REVIEW

The question whether Scott's claims are preempted turns on the interpretation and application of the preemption clause of the MDA. (§ 360k.) Statutory interpretation is a judicial function involving only questions of law. (*Sutco Construction Co.* v. *Modesto High School Dist.* (1989) 208 Cal.App.3d 1220, 1228 [256 Cal.Rptr. 671].) On appeal we independently review the trial court's determination. (*Melamed* v. *City of Long Beach* (1993) 15 Cal.App.4th 70, 76 [18 Cal.Rptr.2d 729].) If the preemption provision applies to Scott's product liability claims, CIBA has established a complete defense and summary judgment was appropriate. (Code Civ. Proc., § 437c.)

In regard to Scott's claim that the trial court erred in denying her a continuance, we find that a continuance was not mandatory because the conditions of Code of Civil Procedure section 437c, subdivision (h) were not

met. We therefore review the court's denial of a continuance under the abuse of discretion standard. (*Mahoney* v. *Southland Mental Health Associates Medical Group* (1990) 223 Cal.App.3d 167, 171-172 [272 Cal.Rptr. 602].)

## GENERAL PRINCIPLES REGARDING PREEMPTION

Many of Scott's arguments are grounded on the strong presumption against federal preemption of state police powers which stems from the respect due to federal-state relations. (*Cipollone* v. *Liggett Group, Inc.* (1992) 505 U.S. 504, 518-519 [120 L.Ed.2d 407, 423-424, 112 S.Ct. 2608, 2618].) Particularly in the area of public health and safety regulations, she argues, state and local regulations must be allowed to co-exist with federal regulations. (*Hillsborough County* v. *Automated Medical Labs.* (1985) 471 U.S. 707, 716-717 [85 L.Ed.2d 714, 723-724, 105 S.Ct. 2371].) A congressional intent to preempt all state law, she continues, may be implied only where the scheme of federal regulation is sufficiently comprehensive to infer that Congress "left no room" for supplementary state regulation (*Ibid.*; *Fidelity Federal Sav. & Loan Assn.* v. *de la Cuesta* (1982) 458 U.S. 141, 152-153 [73 L.Ed.2d 664, 674-675, 102 S.Ct. 3014, 3022]), or where state law actually conflicts with federal law, making compliance with both a "physical impossibility." (*Florida Avocado Growers* v. *Paul* (1963) 373 U.S. 132, 142-143 [10 L.Ed.2d 248, 256-257, 83 S.Ct. 1210]; *Pacific Gas & Elec.* v. *St. Energy Resources Comm'n* (1983) 461 U.S. 190, 203 [75 L.Ed.2d 752, 765, 103 S.Ct. 1713, 1722].)

Scott's reliance on these principles of implied preemption is misplaced, however, since this is a case where Congress's intent to preempt has been "'explicitly stated in the statute's language . . . .'" (*Cipollone* v. *Liggett Group, Inc.*, *supra*, 505 U.S. 504, 516 [120 L.Ed.2d 407, 422, 112 S.Ct. 2608, 2617].) ▪ When Congress has considered the issue of preemption and has included in the enacted legislation a provision expressly addressing that issue, there is no need to engage in an analysis of implied preemption principles. (*Id.* at pp. 518-519 [120 L.Ed.2d at pp. 423-424, 112 S.Ct. at p. 2618]; *Greenwood Trust Co.* v. *Com. of Mass.* (1st Cir. 1992) 971 F.2d 818, 823.) Cases cited by Scott (*Hillsborough County* v. *Automated Medical Labs.*, *supra*, 471 U.S. 707; *Florida Avocado Growers* v. *Paul*, *supra*, 373 U.S. at pp. 142-143 [10 L.Ed.2d at pp. 256-257]; *Michigan Canners & Freezers* v. *Agricultural Bd.* (1984) 467 U.S. 461, 469 [81 L.Ed.2d 399, 406, 104 S.Ct. 2518]; *Silkwood* v. *Kerr-McGee Corp.* (1984) 464 U.S. 238 [78 L.Ed.2d 443, 104 S.Ct. 615]) which deal with implied preemption are thus inapposite here. Instead we look only to the express preemption provision and consider the scope of its application from the language employed by Congress. (*Greenwood Trust Co.* v. *Com. of Mass.*, *supra*, 971 F.2d at p. 823; *King* v. *Collagen*

*Corp.* (1st Cir. 1993) 983 F.2d 1130, 1134; *Stamps* v. *Collagen Corp.* (5th Cir. 1993) 984 F.2d 1416, 1425, fn. 9.)

### THE PREEMPTION PROVISION OF THE MDA

Congress enacted the MDA to give the Food and Drug Administration (FDA) comprehensive regulatory authority over medical devices. (*Slater* v. *Optical Radiation Corp.* (7th Cir. 1992) 961 F.2d 1330, 1331; H.R. Rep. No. 853 94th Cong., 2d Sess., pp. 1, 6-13 (1976).) Pursuant to the MDA, medical devices are grouped into three classes, based on the degree of regulation necessary to assure safety and effectiveness. (*Mendes* v. *Medtronic, Inc.* (1st Cir. 1994) 18 F.3d 13, 14; 21 U.S.C. § 360c.)

All classes of devices are subject to "general controls," including labeling requirements and good manufacturing practices. (See, e.g., 21 U.S.C. §§ 360i, 360j.) Class III devices pose the greatest risks and thus are the most highly regulated. (21 U.S.C. § 360c(a)(1)(C); *Stamps* v. *Collagen Corp.*, *supra*, 984 F.2d at p. 1419.) Class III devices require premarket approval (PMA), an extensive evaluation process which permits the FDA to determine whether a proposed product provides "reasonable assurance of its safety and effectiveness." (*Ibid.*; 21 U.S.C. §§ 360c(a)(1)(C), 360e.)

Contact lens cleaning products, such as AOSEPT, are class III devices under the MDA, and thus must comply with the PMA process. (21 C.F.R. § 886.5928 (1995).)

The PMA process requires a manufacturer to submit a detailed application to the FDA, including information pertaining to product specifications, intended use, manufacturing methods, and proposed labeling. (21 U.S.C. § 360e(c).) The FDA refers each application to a panel of qualified experts who prepare a report and recommendation accepting or rejecting the application. (21 U.S.C. § 360e(d); *Stamps* v. *Collagen Corp.*, *supra*, 984 F.2d at p. 1419.) Once the product receives PMA, the sponsor of the product may begin to market the product. Any subsequent changes in the product require submission of a PMA supplement application. (21 C.F.R. § 814.39 (1995).) Furthermore, to ensure continued validity of the PMA, the product sponsor is required to submit postapproval reports at one-year intervals, identifying any changes in the device or any reports from clinical investigation or scientific literature concerning the device. (21 U.S.C. § 360i; 21 C.F.R. § 814.84 (1995).)

The MDA contains an express preemption provision at section 360k, which provides in subdivision (a) as follows:

"[N]o State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—

"(1)   which is different from, or in addition to, any requirement applicable under [the Act] to the device, and

"(2)   which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under [the Act]."

Scott argues that state tort claims are not mentioned in section 360k, and thus were not intended by Congress to be preempted. She argues further that there are no specific requirements applicable to AOSEPT under the Act. And she claims that because CIBA was able to make changes to the packaging of AOSEPT subsequent to premarket approval, this illustrates the FDA's lack of post-PMA regulation and control of the product. She claims preemption should not operate because CIBA did not establish that it had complied with FDA requirements. And finally, she cites recent California authority for the proposition that certain state causes of action survive federal preemption under the MDA.

## "ESTABLISH OR CONTINUE IN EFFECT . . . ANY REQUIREMENT"

■   Scott maintains that these words in the MDA's preemption provision refer only to requirements established by laws or regulations enacted by the states and do not encompass common law tort actions. Since state tort claims are not expressly included in the language of the preemption clause, she argues, such claims should not be preempted. ■   We must interpret the language of express preemption provisions narrowly, resolving any ambiguity in favor of preserving state power. (*Cipollone* v. *Liggett Group, Inc.*, *supra*, 505 U.S. at pp. 509, 544-548 120 L.Ed.2d at pp. 441-442, 443-444, 112 S.Ct. at pp. 2632, 2634] (separate conc. and dis. opn. of Scalia, J.).)

■   Although the language of section 360k does not expressly include tort claims, virtually every court which has addressed this issue has concluded that preemption under the MDA extends to state court tort claims. (*King* v. *Collagen Corp.*, *supra*, 983 F.2d at p. 1134; *Stamps* v. *Collagen Corp.*, *supra*, 984 F.2d at p. 1421; *Mendes* v. *Medtronic, Inc.*, *supra*, 18 F.3d at p. 18; *Moore* v. *Kimberly-Clark Corp.* (5th Cir. 1989) 867 F.2d 243; *Slater* v. *Optical Radiation Corp.*, *supra*, 961 F.2d 1330; *Gile* v. *Optical Radiation Corp.* (3d Cir. 1994) 22 F.3d 540, 542-543; see also *Cipollone* v. *Liggett Group, Inc.*, *supra*, 505 U.S. at p. 521 [120 L.Ed.2d at pp. 425-426, 112 S.Ct. at p. 2620] [interpreting similar language in the Public Health

Cigarette Smoking Act]; *Evraets* v. *Intermedics Intraocular, Inc.* (1994) 29 Cal.App.4th 779 [34 Cal.Rptr.2d 852]; *Powers* v. *Optical Radiation Corp.*▌ (Cal.App.).)

As the cited cases observe, state regulation can be as effectively exerted through an award of damages as through some other form of preventative relief. (See, e.g., *San Diego Building Trades Council* v. *Garmon* (1959) 359 U.S. 236, 245 [3 L.Ed.2d 775, 783-784, 79 S.Ct. 773, 780].) Thus "jury-set standards . . . in reality . . . constitute new requirements which defendants must heed." (*Hunsaker* v. *Surgidev Corp.* (D.Pa. 1992) 818 F.Supp. 744, 751.) Indeed the FDA itself has made clear that the "State . . . requirement" referred to in section 360k includes any requirement having the force and effect of law "whether established by statute, ordinance, regulation, *or court decision.*" (21 C.F.R. § 808.1(b) (1995), italics added.) Recent California precedent is in accord. (*Evraets* v. *Intermedics Intraocular, Inc., supra,* 29 Cal.App.4th at p. 786.)

Scott cites *Callan* v. *G.D. Searle & Co.* (D.Md. 1989) 709 F.Supp. 662, to support a contrary position. We find *Callan* to be unpersuasive. *Callan* involved an intrauterine device, which the court found was not classifiable as a medical device and was therefore not regulated by the MDA. Nonetheless, the court went on to discuss whether plaintiff's state tort claims would be preempted under section 360k if the intrauterine device were in fact regulated by the MDA. The court's comments can thus be discounted as dicta and indeed run against the great weight of authority in federal and state case law.

### "SPECIFIC COUNTERPART REGULATIONS"

Not all state laws regulating a particular device are preempted under section 360k. Only state requirements which are "different from, or in addition to" specific federal requirements regarding the same device are affected. (§ 360k(a)(1).) As the federal regulations provide, state and local requirements are preempted "only when the Food and Drug Administration has established specific counterpart regulations or there are other specific requirements applicable to a particular device under the [A]ct. . . ." (21 C.F.R. § 808.1(d) (1995).)

▌ Scott argues that in this case there were no specific counterpart regulations or requirements in the federal scheme applicable to contact lens cleaning solutions. Therefore, her state tort claims should not be preempted.

We disagree. All class III medical devices are subject to the requirements of the MDA, including the extensive review and evaluation involved in the

PMA process. Among other things, "[t]he FDA retains rigid control over the entirety of the labeling and packaging of class III products . . . ." (*King* v. *Collagen Corp.*, *supra*, 983 F.2d at p. 1135.) The control extends to the size and location of a warning on a label, as well as its content. (See, e.g., 21 U.S.C. § 360e(c)(1) and 21 C.F.R. §§ 801.4, 801.5, 801.15, 814.20(b)(10), (e) (1995).) In fact the product's sponsor must submit a proposed label to the FDA for analysis and review prior to gaining PMA for the product. (21 U.S.C. § 360e(c)(1)(F).) A PMA application will be denied if there is an insufficient showing that the product is safe and effective "under the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof," or if the proposed labeling is misleading in any particular. (21 U.S.C. § 360e(d)(2)(A), (B), (D).)

The MDA also imposes extensive postapproval regulations to keep the FDA apprised of any new information or safety findings relating to class III devices. (21 U.S.C. §§ 360e(e), 360i; see also 21 C.F.R. § 803 (1995).) Furthermore, under the product problem reporting program, health professionals and consumers can notify the FDA when they have had an adverse experience involving an approved medical device. The FDA may withdraw approval of the device permanently or suspend its approval temporarily at any time if it determines that the device has become unsafe or its labeling inadequate. (21 U.S.C. § 360e(e).)

Ophthalmic devices are covered under 21 Code of Federal Regulations section 886 et seq. (1995). The soft contact lens cleaning solution is specifically identified in section 886.5928, as "a device intended to clean, disinfect, wet, or store a soft . . . contact lens," and is classified as a class III device, subject to the PMA process. (21 C.F.R. § 886.5928(a), (b) (1995).)

Scott argues that the FDA has not promulgated a specific warning with regard to contact lens cleaners as it has with other products, for example, cigarettes or tampons. We do not believe a product-specific warning, issued by the FDA, is necessary for preemption. Here the AOSEPT product, by virtue of its class III status, was expressly made subject to the "specific counterpart regulations" contained in the MDA, including FDA approval of the proposed label. Scott's state tort action is based on allegations that the product was unsafe and dangerous because the warnings on the label were inadequate. If she were to prevail, a judgment in her favor would constitute a requirement "different from, or in addition to" the labeling requirements which were specifically imposed by the MDA in the process of approving this particular product for marketing. (21 C.F.R. § 808.1(d) (1995).)

Recent cases support this view and illustrate the complete preemptive effect of the PMA process on state law tort claims involving inadequate

labeling or failure to warn. In *Stamps* v. *Collagen Corp., supra,* 984 F.2d 1416, for example, the court concluded that the class III PMA process itself constitutes a "specific requirement applicable to a particular device" within the meaning of both section 360k of the MDA and section 808.1(d) of the Code of Federal Regulations. (984 F.2d at pp. 1421-1422, fn. 3.) "[Plaintiff]'s inadequate labeling . . . and failure to warn . . . allegations are preempted by the MDA. The Class III regulatory structure . . . involves the FDA in considerable oversight regarding proposed package labeling of a device." (*Id.* at pp. 1421-1422.) *Martello* v. *CIBA Vision* (8th Cir. 1994) 42 F.3d 1167, which involved the same product as in our case, reached the same result. (In accord, *King* v. *Collagen Corp., supra,* 983 F.2d 1130; *Slater* v. *Optical Radiation Corp., supra,* 961 F.2d 1330; *Duncan* v. *Iolab Corp.* (11th Cir. 1994) 12 F.3d 194; *Tarallo* v. *Searle Pharmaceutical, Inc.* (D.S.C. 1988) 704 F.Supp. 653, 656 [". . . any cause of action based on testing, labeling or marketing is preempted by the FDA standards for premarket approval."].)

We conclude, in line with this authority, that the FDA premarket approval of the AOSEPT product is a "specific counterpart regulation" to state tort law. (21 C.F.R. § 808.1(d) (1995).)

Scott points out that the federal regulatory scheme allows a manufacturer to make post-PMA changes to a product, such as strengthening warnings, without first obtaining approval from FDA. She contends that this demonstrates a lack of federal regulation in this area. Thus a state action resulting in a strengthened warning would not be contrary to any specific federal counterpart and would therefore not be preempted.

Scott is inaccurate in her assertion that safety-enhancing changes made to a class III device are not regulated by the FDA. The Code of Federal Regulations provides a specific process for obtaining a "PMA Supplement" from the FDA when unanticipated adverse effects or device failures necessitate a labeling, manufacturing or other device modification. (21 C.F.R. § 814.39(a) (1995).) If a manufacturer makes a change which "enhances the safety of the device or the safety in the use of the device," such a change may be placed into effect prior to written FDA approval. (21 C.F.R. § 814.39(d)(2) (1995).) However, the manufacturer must nonetheless submit a "Special PMA Supplement" application which details the basis for the change and identifies the date that such changes are to be effected. Furthermore, the applicant must "receive[] acknowledg[]ment from [the] FDA of receipt of the supplement" prior to placing the proposed changes in effect. (21 C.F.R. § 814.39(d), (e) (1995).) That is the procedure CIBA followed here, as we explain more fully below. Thus the post-PMA changes to the AOSEPT product do not reflect action outside the federal regulatory scheme but rather compliance with it.

## COMPLIANCE WITH THE PMA PROCESS

█ Scott contends CIBA did not submit sufficient proof to establish that at the time of her injury AOSEPT had complied with PMA requirements and was approved by FDA and subject to its regulation. We believe the record establishes compliance.

The record shows that the initial application for PMA was filed June 10, 1982, and that the AOSEPT product first received PMA under the name SEPTICON on March 17, 1983, with an assigned PMA number of P820040. At that time the product was manufactured and sold by American Optical Corporation. The published notice of approval, dated April 8, 1983, states that the PMA was based on the recommendation of the ophthalmic device section of the Ophthalmic, Ear, Nose and Throat and Dental Devices Panel, an FDA advisory committee. After review and evaluation, the FDA determined the product "had been shown to be safe and effective for use as recommended in the submitted labeling."

On March 21, 1984, the American Optical Corporation applied for a supplemental PMA, incorporating improvements in the currently approved SEPTICON system, and changing the name of the improved version to AOSEPT. New labeling was submitted. This application was evaluated and approved by FDA, which issued a supplemental PMA authorizing marketing of the product as modified, October 3, 1984.

In 1985, CIBA purchased the American Optical Corporation's soft contact lens business, thus acquiring the right to manufacture and distribute American Optical Corporation's line of soft contact lens products, including AOSEPT. On February 25, 1986, CIBA notified FDA of the purchase and applied for a supplemental PMA for repackaging of the products. This supplemental PMA was approved May 5, 1986.

As with all class III devices subject to the PMA process, continued approval was conditioned upon submission of annual postapproval reports. The conditions of approval of a product further provided that the manufacturer could effect changes enhancing the safety of a product, specifically by strengthening the warning on the label or the instructions for use of the product, by submitting a "Special PMA Supplement" application detailing the proposed changes.

This procedure was followed by CIBA in 1990 when it sent a special PMA supplement application notifying the FDA that it would be changing the white bottle tops to red bottle tops on AOSEPT and two other contact

lens cleaning and disinfecting products. The application explained that this change was being instituted to increase consumer safety because lens care products in similar bottles were often confused, with the result that products not intended for ocular instillation, namely lens cleaners and disinfectants, were accidentally put directly into the eye. The red bottle top was intended to alert the consumer to this danger. CIBA also proposed to revise the labeling, which would include a warning not to insert the product with the red bottle top directly into the eye. The special PMA supplement application included samples of the revised bottle labeling.

CIBA received approval from the FDA for this special PMA supplement on February 8, 1991. The approval letter identified AOSEPT by the original PMA number, P820040, and indicated that CIBA was authorized to begin commercial distribution of the product as modified.

Scott's injury occurred several months later on August 1, 1991. When she mistakenly applied AOSEPT to her contact lens and then inserted the lens directly into her eye, she was apparently using a bottle with the old white top.

The fact that Scott purchased the product in its unmodified form is not relevant to the question of preemption. The record adequately demonstrates that the AOSEPT product was subject to class III MDA regulation at the time of the injury and that the FDA had in fact approved the product for marketing, both in its original and in its new improved packaging.

Scott cites *Meyer* v. *International Playtex, Inc.* (D.N.J. 1988) 724 F.Supp. 288, 293 and *National Bank of Commerce* v. *Kimberly-Clark Corp.* (8th Cir. 1994) 38 F.3d 988, 993, for the proposition that her state tort claims are not preempted if it is shown that defendant's warnings were not in compliance with applicable federal standards.

*Meyer* and *National Bank* are inapposite, since those cases concerned class II devices, namely tampons, which are not subject to the same rigorous PMA process under the MDA as are class III devices. The court in *National Bank* noted that if the tampon were subject to the class III requirements, including approval of all labeling prior to marketing, plaintiff's claims that defendant's warnings failed to comply would be preempted. "[A]ctual agency approval," the court stated in a footnote, "eliminates any possible claims under state tort law for failure to comply with federal requirements." (*National Bank of Commerce* v. *Kimberly-Clark Corp.*, *supra*, 38 F.2d at p. 994, fn. 4.)

Here the evidence, as summarized above, established that the AOSEPT labeling was in full compliance with FDA requirements at the time of Scott's

accident in 1991. AOSEPT had FDA approval as it was originally packaged with the white bottle top and CIBA had obtained supplemental approval in February of 1991 to begin marketing the product with a red top instead of white. Scott claims that CIBA did not include in evidence prior annual reports, supplemental applications and other proof that the conditions of approval continued to be satisfied. However, she has not shown how the reports and supplemental applications from prior years would affect the product's class III FDA-approved status at the time of the injury.

Scott raises several additional evidentiary claims in her reply brief.[1] ▮ We do not entertain issues raised for the first time in a reply brief, in the absence of a showing of good cause why such issues were not raised in the opening brief. (*American Drug Stores, Inc.* v. *Stroh* (1992) 10 Cal.App.4th 1446 [13 Cal.Rptr.2d 432]; *Neighbours* v. *Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8 [265 Cal.Rptr. 788].) No good cause appearing here, we will disregard these issues.

### RECENT CALIFORNIA AUTHORITY

Recently two California cases from the Second District have addressed the issue of federal preemption under the MDA. (*Evraets* v. *Intermedics Intraocular, Inc.*, *supra*, 29 Cal.App.4th 779 and *Powers* v. *Optical Radiation Corp.*, *supra*.) The device involved in both of those cases was an intraocular lens (IOL), which is implanted surgically into the eye. (See also *Gile* v. *Optical Radiation Corp.*, *supra*, 22 F.3d 540 and *Slater* v. *Optical Radiation Corp.*, *supra*, 961 F.2d 1330, concerning a similar device.)

While *Evraets* and *Powers* provide important state precedent in this area, they differ from our case in one respect: the IOL is an investigational device. As such it is subject to the "Investigational Device Exemption Regulations" for intraocular lenses (21 C.F.R. 813 et seq. (1995)), but it is exempt from the PMA requirements. Exemption from the PMA process in the case of an investigational device is intended to encourage the discovery and development of useful medical products. (21 U.S.C. § 360j(g)(1).) Unlike the manufacturer of a nonexempt class III device, such as CIBA, the manufacturer of an investigational device who has applied for and received the exemption is not required to establish the safety and effectiveness of the device before it can be sold. (*Slater* v. *Optical Radiation Corp.*, *supra*, 961 F.2d at pp.

---

[1]She contends that the declarations in support of CIBA's motion contained inadmissible hearsay and were made without personal knowledge of the attached documents. She claims further that CIBA's proof included unsworn hearsay letters from its own employees and uncertified copies of documents from the FDA.

1331-1332.) In other respects both exempt and nonexempt devices are regulated by the FDA and both are subject to the MDA preemption provision.

Evraets and Powers were both dismissed on demurrers in the trial court. On appeal in Evraets, the court held that causes of action for negligence and strict liability were preempted by the MDA, but that other causes of action were not, including breach of express and implied warranty, fraud, and negligence per se. Powers adopted Evraets for the most part, concluding, however, that a cause of action alleging negligence per se was preeempted.[2] In a dissent in Powers, Justice Turner concluded that fraud-based state tort claims were also preempted under the MDA.

We need not enter the debate regarding the preemptive effect of the MDA on state law fraud claims, since Scott has not pleaded a cause of action for fraud. Her complaint includes only products liability causes of action for strict liability, negligence, and implied warranty. As to the first two causes of action, our conclusion that these claims are preempted by the MDA is in accord with Evraets and Powers. As to the breach of implied warranty claim, the Evraets court departed from established law by finding that such a state law cause of action could survive preemption. (See, e.g., *Duncan* v. *Iolab Corporation, supra*, 12 F.3d 194; *Slater* v. *Optical Radiation Corp., supra*, 961 F.2d at pp. 1332-1334; *Mendes* v. *Medtronic, Inc., supra*, 18 F.3d at p. 19.) The court went on to find, however, that in the case of the IOL, which is sold to the surgeon who then implants it in the patient's eye, the requisite privity was lacking.

Scott asks that we find there is privity here and that we therefore adopt the *Evraets* court's analysis and conclude that her breach of implied warranty claim survives preemption under the MDA. We decline to do so. Scott's claim is based on allegations that the manufacturer of the device, which was safe if used as directed, failed to provide adequate directions and warnings. ■ Established precedent holds that implied warranty claims premised on inadequate warnings are preempted by the MDA, for the reason that the FDA premarket approval process regulates the content and appearance of class III medical device labels. (*Mendes* v. *Medtronic, Inc., supra*, 18 F.3d at p. 18; *Moore* v. *Kimberly-Clark Corp., supra*, 867 F.2d at pp. 246-247; *King* v. *Collagen Corp., supra*, 983 F.2d at p. 1139.) If a fact finder applying state breach of warranty law could find that a label which complied with FDA requirements was deficient, such a finding would establish a standard for

---

[2]*Powers* also noted that appellant had "properly concede[d]" that a breach of implied warranty claim was preempted. (*Powers* v. *Optical Radiation Corp., supra*.)

an adequate warning which would be "in addition to" the requirements applicable under the Act. (*Mendes* v. *Medtronic, Inc., supra,* at p. 18.) That result is prohibited under section 360k.

■ Next, Scott urges us to adopt the holding in *Evraets* that a claim of negligence per se survives preemption. In *Evraets* the claims which were allowed were based on allegations of lack of informed consent and product adulteration. Those claims are specific to the investigational device exemption requirements for IOL's and do not apply to our case. In any event, however, we disagree with *Evraets* that negligence per se provides a theory of recovery which is not preempted.

In *Evraets* the court reasoned that where federal laws and regulations establish a certain standard of conduct, violation of those laws may provide the basis for a state law claim. The court thus recognized the right of an injured person to sue a manufacturer of a medical device for failure to comply with federal laws governing that device. *Powers* disagreed with this analysis, finding it was "tantamount to creating a private right of action to enforce FDA regulations concerning medical devices where no such right exists." (*Powers* v. *Optical Radiation Corporation, supra,* 37 Cal.App.4th at p. 1452.) The *Powers* majority continued: "[W]e hesitate to find such a right because doing so would place with non-expert triers of fact the determination whether a medical device complies with applicable federal regulations, a necessarily complicated technical question better left to the FDA's expertise." (*Ibid.*) The court concluded that there is no private right of action to enforce compliance with FDA regulations and that any assertion of failure to comply is preempted. (*Id.* at p. 1454; *Rodriguez* v. *SK & F Co.* (1st Cir. 1987) 833 F.2d 8, 9; *Pacific Trading Co.* v. *Wilson & Co., Inc.* (7th Cir. 1976) 547 F.2d 367, 370.)

We agree with *Powers* on this issue. As that court observed, there is no basis for allowing a negligence claim to proceed, based upon the per se presumption codified in Evidence Code section 669, while finding that negligence itself is a preempted cause of action. Moreover, if this were so California plaintiffs would have an advantage over plaintiffs in other jurisdictions, all of which prohibit state claims based on asserted violations of federal regulations. (*Reeves* v. *Acromed Corp.* (5th Cir. 1995) 44 F.3d 300; *Michael* v. *Shiley, Inc.* (3d Cir. 1995) 46 F.3d 1316; *National Bank of Commerce* v. *Kimberly-Clark Corp., supra,* 38 F.3d at p. 994, fn. 4; *Gile* v. *Optical Radiation Corp., supra,* 22 F.3d at p. 544.)

### DENIAL OF MOTION FOR A CONTINUANCE

■ Scott contends that the trial court should have granted a continuance of the summary judgment motion so that she could complete discovery

and obtain over 15,000 pages of documents she claims are relevant to the preemption issue.

At the time Scott filed her written response to CIBA's summary judgment motion, July 26, 1993, she argued that the motion was premature because she had not completed necessary discovery. The day after her responding papers were filed, a different superior court judge ruled on her pending motions to compel production of documents and to compel further answers to interrogatories, granting the motions with certain limitations. An order was filed July 28, 1993, detailing documents to be produced and interrogatories to be answered by CIBA within 30 days. In addition, a special master was appointed to supervise further discovery matters.

When the court initially granted CIBA's summary judgment motion, by minute order dated August 13, 1993, those discovery orders were outstanding. The court subsequently vacated its order granting summary judgment to allow further oral argument on matters raised for the first time in CIBA's reply brief on the summary judgment motion. Scott filed a motion asking the court to take judicial notice of the pending discovery orders and argued again, at the second oral argument on the summary judgment motion, that CIBA's motion was premature because discovery was not complete.

In its second order granting CIBA summary judgment, the court specifically denied counsel's request for a continuance. The court stated as its reason that no affidavit had been filed in support of the request for a continuance, pursuant to Code of Civil Procedure section 437c, subdivision (h). That section provides as follows: "If it appears from the affidavits submitted in opposition to a motion for summary judgment or summary adjudication or both that facts essential to justify opposition may exist but cannot, for reasons stated, then be presented, the court shall deny the motion, or order a continuance to permit affidavits to be obtained or discovery to be had or may make any other order as may be just."

Scott claims that the discovery orders, which detailed documents ordered to be produced by CIBA, amounted to affidavits within the meaning of Code of Civil Procedure section 437c, subdivision (h) in that they identified the outstanding evidence necessary to oppose the summary judgment motion. The court apparently rejected this claim, although it took judicial notice of the discovery orders.

The purpose of the affidavit required by Code of Civil Procedure section 437c, subdivision (h) is to inform the court of outstanding discovery which is necessary to resist the summary judgment motion. (*Wachs* v. *Curry* (1993)

13 Cal.App.4th 616, 622-624 [16 Cal.Rptr.2d 496]; *People* ex rel. *Department of Transportation* v. *Outdoor Media Group* (1993) 13 Cal.App.4th 1067, 1077 [17 Cal.Rptr.2d 19]; *Korens* v. *R.W. Zukin Corp.* (1989) 212 Cal.App.3d 1054, 1061 [261 Cal.Rptr. 137].) "To be entitled to a continuance, the party opposing the motion for summary judgment must show that its proposed discovery would have led to 'facts essential to justify opposition.' " (13 Cal.App.4th at p. 1077.)

Here the only issue at summary judgment was whether Scott's products liability action was preempted under section 360k. As we have discussed above, there are basically two aspects to the inquiry: was the product which allegedly caused plaintiff's injury a medical device subject to the requirements of the MDA, and did plaintiff's tort claims seek to impose requirements different from or in addition to those already imposed under the federal scheme relating to that product's safety? CIBA's moving papers established both of these issues in its favor. It was incumbent upon plaintiff to show by affidavit that the extensive discovery requested could reasonably lead to evidence necessary to refute the essential facts of preemption. Scott submitted no such affidavit. Since the conditions of section 473c, subdivision (h) were not met, continuance was not mandatory. (*Mahoney* v. *Southland Mental Health Associates Medical Group*, *supra*, 223 Cal.App.3d at pp. 171-172 [272 Cal.Rptr. 602].) We find no abuse of discretion in the court's denial of a continuance under the circumstances here. (*Ibid.*)

### PROTECTION OF CONSUMERS OF MEDICAL DEVICES

We turn last to public policy considerations raised by Scott. She argues that the MDA were enacted to address the perceived inadequacy of existing law to protect consumers from "increasingly complex devices which pose serious risk if inadequately tested or improperly designed or used." (Sen. Rep. No. 33, 94th Cong., 2d Sess., p. 5, reprinted in 1976 U.S. Code Cong. & Admin. News, pp. 1070, 1075; *Larsen* v. *Pacesetter Systems, Inc.* (1992) 74 Hawaii 1 [837 P.2d 1273]; *Elbert* v. *Howmedica, Inc.* (D. Hawaii 1993) 841 F.Supp. 327, 329.) This purpose would be frustrated, she argues, by precluding state tort claims based on injuries resulting from those medical devices. In her view, the public can be protected only if we regard the FDA regulations as establishing the minimum safety standards. If those standards have not adequately protected consumers from unsafe medical products, consumers should be allowed to proceed in state court to supplement federal regulations and establish a ceiling on consumer protection. (See, e.g., *Ferebee* v. *Chevron Chemical Co.* (D.C. Cir. 1984) 736 F.2d 1529, 1543 [237 App.D.C. 164]; *Hunsaker* v. *Surgidev Corp.*, *supra*, 818 F.Supp. at p. 749.) Otherwise injured parties will have no remedy whatsoever.

The absence of a federal remedy will not defeat preemption, however, where Congress has indicated an express intent to preempt state common law damages actions, as it has by passage of the MDA. (*Stamps* v. *Collagen Corp.*, *supra*, 984 F.2d at p. 1425, see also fn. 11.) Moreover, Scott's argument that the FDA regulations form the "floor" of protection while the states are free to construct a regulatory "ceiling" has been rejected in federal court in *Stamps* v. *Collagen Corp.*, *supra*, 984 F.2d at page 1424.

We conclude, as did the court in *Stamps*, that the federal regulations in this case, which specifically provided for FDA approval and review of the labeling of this class III device, were intended to establish, and did establish, the maximum consumer protection regarding the adequacy of warnings. Thus preemption is unavoidable.

Scott's argument that preemption under the MDA is tantamount to granting manufacturers of medical devices virtual immunity from liability for all manner of improper acts, has similarly been rejected. (*Gile* v. *Optical Radiation Corp.*, *supra*, 22 F.3d 540.) The detailed evaluation, review and regulation we have discussed herein are designed to expose shoddy clinical investigations and negligently designed and manufactured medical devices. Moreover, as the court pointed out in *Gile*, a manufacturer who violates FDA regulations or the provisions of the Act is subject to punishment by significant fines, civil penalties, and imprisonment. (*Id.* at p. 546.)

While the broad purpose of the FDA scheme is to promote public health, that purpose encompasses not only the protection of the individual user of the product but also the need to encourage research and development and permit new and improved devices to be marketed without delay. Setting uniform standards for manufacturers and providing a shield from state law intrusion is consistent with this purpose. (*King* v. *Collagen Corp.*, *supra*, 983 F.2d 1130, 1138 citing U.S. Code Cong. & Admin. News, 94th Cong., 2d Sess. vol. 3, p. 1070 et seq.; *Tarallo* v. *Searle Pharmaceutical, Inc.*, *supra*, 704 F.Supp. at p. 655; *Mendes* v. *Medtronic, Inc.*, *supra*, 18 F.3d at p. 16.) Thus Congress could reasonably have weighed possible loss in isolated cases against benefits to the public generally. "Perfection is impossible and a few individuals may be denied full protection at the cost of benefitting the rest." (*King* v. *Collagen Corp.*, *supra*, 983 F.2d at p. 1138, conc. opn. of Aldrich, J.)

Finally, Scott contends that the FDA has been ineffective in the task of regulating medical devices. The only way the FDA can ensure the safety of medical devices, she argues, is to rely upon the manufacturers themselves to voluntarily report incidents causing injuries, a practice which clearly runs against their economic interests. Thus the FDA is incapable of discharging

its obligation to protect consumers from unsafe medical products. Scott stresses this point, citing at length from a report entitled "Less Than the Sum of its Parts, Reforms Needed in the Organization, Management, and Resources of the Food and Drug Administration's Center for Devices and Radiological Health, A Report by the Subcommittee on Oversight and Investigations of the Committee on Energy and Commerce of the United States House of Representatives," May 1993 (103d Cong., 1st Sess., Comm. Print No. 103-N.) We decline to address this issue, which is well beyond the scope of our inquiry regarding preemption under section 360k.

Disposition

The judgment is affirmed.

Cottle, P. J., and Wunderlich, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 21, 1995. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.