Jeanette Renee TARALLO, Plaintiff,

v.

SEARLE PHARMACEUTICAL, INC.,
d/b/a G.D. Searle & Company,
Defendant.

Civ. A. No. 8:86–3162–17.

United States District Court,
D. South Carolina,
Anderson Division.

Dec. 16, 1988.

Steven M. Krause, Epps, Krause & Nicholson, Anderson, S.C., for plaintiff.

H. Simmons Tate, Jr., John C. Bruton, Jr., Boyd, Knowlton, Tate & Finlay, P.A., Columbia, S.C., Laura A. Kaster, Chicago, Ill., for defendant.

## ORDER

JOE F. ANDERSON, Jr., District Judge.

This matter is before the court on defendant Searle's motion for summary judgment pursuant to *Fed.R.Civ.P.* 56. Searle contends there is no factual dispute that Ms. Tarallo's claims are preempted by various federal statutes and regulations. Two hearings have been held regarding this motion and extensive memoranda and exhibits have been filed by each party. After a thorough review of the record, the factual allegations and legal principles, the court hereby denies Searle's motion.

Ms. Tarallo is seeking to recover damages for injuries she allegedly sustained as a result of using Searle's product, the Copper 7 intrauterine contraceptive (Cu–7). On or about March 5, 1979 Ms. Tarallo was fitted by her physician with a Cu–7. Ms. Tarallo alleges she became violently ill on December 6, 1980 and was hospitalized with pelvic inflammatory infection (PID). PID ultimately rendered her infertile.

Ms. Tarallo relies on several legal theories to support her claim: strict liability in tort (S.C.Code Ann. § 15–73–10 to—30 (1976), negligence, and breach of implied and express warranties (S.C.Code Ann. §§ 36–2–314 and 36–2–315). Searle advances two preemption arguments which it maintains foreclose Ms. Tarallo from seeking any redress here.

First, Searle relies on this court's reasoning in *Stewart v. International Playtex,* 672 F.Supp. 907 (D.S.C.1987), to contend 21 U.S.C. § 360k of the Medical Device Amendments of 1976 (the Amendments) preempts Ms. Tarallo's state law claims. This argument is predicated on a finding the Cu–7 is a device within that statutory framework. Second, if the Cu–7 is deemed to be a drug rather than a device, Searle argues the federal Food and Drug Administration (FDA) regulations governing the approval and sale of the Cu–7 preempt any stricter state law requirements. *See Hurley v. Lederle Laboratories,* 851 F.2d 1536 (5th Cir.1988). Finally, Searle contends an adverse jury verdict would violate the Commerce Clause of the United States Constitution by imposing an unreasonable burden upon its interstate trade. U.S. Const. art. I, § 8, cl. 3.

I. The Medical Device Amendments

The court has previously recognized the preemptive effect of the regulations promulgated under the Amendments. *Stewart,* 672 F.Supp. at 909. In *Stewart,* the plaintiff sought damages resulting from his daughter's death, allegedly caused by her use of a tampon manufactured by the defendant. The tampon was conceded to be a Class II device within the meaning of the Amendments. The court granted partial summary judgment on behalf of the defendant based on the authority of 21 U.S.C. § 360k. The court reasoned that to allow a jury to impose labeling requirements different from those required by the FDA would vitiate the Act's purpose of setting uniform standards for manufacturers. *Stewart,* 672 F.Supp. at 909. As a result of this decision the plaintiff could recover under a theory of inadequate warning only if he showed Playtex deviated from the labeling requirements of 21 C.F.R.

§ 801.430(d) (1988), with respect to the tampons purchased and used by his daughter.

In this action Searle also relies on the following relevant portion of 21 U.S.C. § 360k:

No state ... may establish ... with respect to a device ... *any requirement* ... which is different from, or in addition to, any requirement applicable under this chapter to the device ... which relates to the safety and effectiveness of the device.

21 U.S.C. § 360k (emphasis added).

By its express terms § 360k only applies to "medical devices" and not "prescription drugs." A device is "an instrument ... implement ... or other similar or related article which is ... intended to affect the structure or any function of the body of man...." 21 U.S.C. § 321(h)(3) (as amended). A device does not carry out its purpose "through chemical action within ... the body of man ... and ... is not dependent upon being metabolized" in order to achieve the purpose for which it is intended. *Id.* Conversely, a drug is an article which is "intended to affect the structure or any function of the body of man ... but [the category] does not include devices...." 21 U.S.C. § 321(g)(1)(C). By their definitions the terms are mutually exclusive.

A. *The Cu–7 Approval Process*

When Searle applied for market clearance of the Cu–7 the FDA had the authority to require premarket testing of drugs but no similar ability to regulate the introduction of devices to the public. The FDA determined the Cu–7 would be considered a new drug. *See* S.Rep. No. 670, 93d Cong., 2d Sess. 5 (1973). Three factors led to this conclusion: an expansion of FDA power,[1]

---

1. The authority of the FDA over drugs was greatly expanded by the Court in *United States v. Bacto–Unidisk,* 394 U.S. 784, 89 S.Ct. 1410, 22 L.Ed.2d 726 (1969). In *Bacto–Unidisk* the Court determined the statutory definition of "drug" was far broader than the definition set forth by the medical profession. 394 U.S. at 793, 89 S.Ct. at 1415. It thus included products in a category greater than the traditional category of drugs ingested in or applied to the body and the diagnostic disk at issue was found to be subject to premarket regulations. *Id.* This decision sparked an intense debate as to whether all IUDs should be considered drugs or devices. *See, e.g.,* Regulation of Medical Devices (Intrauterine Contraceptive Devices): Hearings Before a Subcommittee of the Committee on Government Operations, House of Representatives 93rd Cong., 1st Sess. 146 (1973) (Devices Hearings), at 205–06 (letter from William Goodrich, FDA Assistant General Counsel), 215 (Bu-

recognition of previous safety problems arising out of intrauterine contraceptive (IUD) use and the metallic composition of the Cu–7. Devices Hearings, *supra* note 1, at 208–9 (letter from Peter B. Hutt, Assistant General Counsel, Food, Drugs and Product Safety Division); 293 (statement of Dr. Jennings). The device IUDs already on the market were not reclassified at that time for a number of reasons. Devices Hearings, *supra* note 1, at 211–12, 217–18 (Jennings), 260 (Hutt), 253–54 (memorandum from L. Pilot), 208–09 (Hutt).

After a three year process, in 1974 the Searle Cu–7 was approved by the FDA as a safe and effective drug. Marketing was thus allowed two years prior to the enactment of the Amendments. *See* Defendant's Exhibit 16, FDA Approval Letter (Feb. 24, 1974). In seeking approval, Searle was required to complete a seemingly rigorous regulatory process including clinical investigations and submission of documentary evidence and proposed labeling requirements. *See generally* 21 C.F.R. § 130 (1971).

The Cu–7 differed from other IUDs in that the inflammatory reaction within the body was enhanced by a small amount of copper wire coiled around the vertical limb of the IUD. *See* Battelle Memorial Institute Report 118–119 (August 11, 1975). In exclusively plastic IUDs the action is caused by the plastic itself. Searle maintains the general mechanism by which either IUD achieves the contraceptive effect is identical and that the Cu–7, like all IUDs, promotes contraception through an inflammatory reaction, not through direct chemical or metabolic action.

Searle argues the FDA's initial decision to classify the Cu–7 as a drug was merely an administratively convenient method by which the FDA could require its premarket testing. The FDA recognized the copper in the IUD slowly dissolved in the body. Ms. Tarallo contends the drug classification was not an anomoly, as the copper in the Cu–7 interacted pharmacologically with the

body tissue. Devices Hearings, *supra* note 1, at 209 (Hutt).

### B. *The Effect of the Amendments*

Two years after approval of the Cu–7 the Amendments granted the FDA expanded authority over devices. The Amendments set forth three classifications, for which different controls apply. 21 U.S.C. § 360c. Class I devices require general controls and the category includes items such as dye and chemical solution stains, synthetic cell and tissue cultures, chromosome culture kits, tissue processing equipment, blood bank supplies and examination gowns. 21 U.S.C. § 360c(a)(1)(A); 21 C.F.R. §§ 864.-1850, 864.2220, 864.2260, 864.3010, 864.-9050, 880.6265 (1988).

Class II devices are controlled through performance standards, such as labeling requirements. 21 U.S.C. § 360c(a)(1)(B). Anesthetic gas masks, oxygen masks, tampons, diaphragms, visual field laser instruments and eye movement monitors are examples of Class II devices. 21 C.F.R. §§ 868.5550, 868.5580, 884.5460, 884.5470, 884.5350, 886.1360, 886.1510 (1988).

Class III devices must be approved prior to their being marketed. Premarket approval assures testing of those devices which pose "potential unreasonable risk[s] of . . . injury." 21 U.S.C. § 360c(a)(1)(C). Included in this category are soft contact lenses and associated agents and solutions, obstetric data analyzers, and bone cement. 21 C.F.R. §§ 886.5925, 886.5928, 886.5933, 884.2050, 888.3027 (1988).

It is important to note the distinctions between the classes and the amount of FDA involvement with each since the *Stewart* reasoning would preempt only that which is governed by the FDA. In other words, the preemptive effect of § 360k on a Class II device is not as broad as its effect on a Class III device, where any cause of action based on testing, labeling or marketing is preempted by the FDA standards for premarket approval. In *Stewart*, the court only preempted the imposition of labeling requirements different

reau of Medicine memorandum), 245 (statement of Rep. Fountain), 249 (statement of Larry

Pilot, Office of Medical Devices).

from those set by the FDA. The question of compliance remained open.

Under *Fed.R.Civ.P.* 56, summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Rule 56(c).

When the defendant is the moving party and the plaintiff has the ultimate burden of proof on an issue, the defendant must identify the parts of the record that demonstrate the plaintiff lacks sufficient evidence. The nonmoving party, here the plaintiff, must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Rule 56(e). *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### C. *Current Classification of the Cu–7*

There is no dispute the FDA initially classified the Cu–7 as a "new drug" in order that testing be completed before its entry into the market. Searle rests its preemption argument on transitional language of the Amendments which purports to reclassify new drugs as Class III devices. Specifically, the new classification applies to any product which fits within the new definition of device (as set forth above) and "for which an approved New Drug Application (NDA) was in effect on May 28, 1976." 42 Fed.Reg. 63,472 (1977); *see also* 21 U.S.C. § 360j(*l*)(1).

The provision also deems the device to be preapproved as a device if previously approved as a drug. 21 U.S.C. § 360j(*l*)(3)(A)(i). The requirements set by the Bureau of Drugs continue to apply to the "device until changed by the Secretary as authorized" by the statute. 21 U.S.C. § 360j(*l*)(3)(A)(ii).

Responsibility for the transitional products was to "gradually shift ... from the Bureau of Drugs to the Bureau of Medical Devices at a pace consistent with the availability of manpower and administrative and technical capabilities." 42 Fed.Reg. at 63,-472. Despite this procedural plan, the FDA continued to treat the Cu–7 as a drug IUD regulated by the Bureau of Drugs. Searle maintains this consideration was not a formal agency construction of the Amendments but was exclusively a matter of "administrative consideration relating to the efficient carrying out of FDA's responsibilities." *See* Affidavit of Alexander M. Schmidt, M.D. (March 4, 1988).

The distinction between drug and device IUDs "is unaffected by the revised definition of device found in the ... Amendments...." 42 Fed.Reg. 23,772 (1977). Still regulated as drugs are IUDs which incorporate "heavy metals, drugs, or other active substances to increase the contraceptive effect, to decrease adverse reactions, or to provide increased medical acceptability...." 38 Fed.Reg. 6137 (1973).

In response to Dr. Schmidt's affidavit, Ms. Tarallo points to several Searle-generated exhibits. This literature at least raises a material factual issue as to whether the copper in the Cu–7 works to "increase the contraceptive effect" of the IUD so as to require its continued classification as a drug and render § 360k irrelevant.

In Searle's patient brochure of 1971 (Plaintiff's Exhibit 6) the company touted the "big difference between an ordinary IUD and the Cu–7...." 1971 Brochure at 3. Moreover, the brochure set forth Searle's original claim that copper, not plastic, was the contraceptive agent of the Cu–7. 1971 Brochure at 5. It suggested replacement of the IUD once the copper had worn out. *Id.* This assertion was not included in the revised brochure of 1975. Plaintiff's Exhibit 7. However, the new pamphlet did attribute the Cu–7's superior contraceptive propensities to the presence of copper in the IUD. 1975 Brochure at 3. Adding copper to the plastic as found alone in the other IUDs resulted in the Cu–7 being "almost as effective as the 'pill'...." *Id.* In addition a news release produced by Searle stated the presence of copper was "a significant breakthrough in IUD research and development." Plaintiff's Exhibit 8. It further claimed "a minute amount of copper released daily *enhances* contraception" through "medicated action."

*Id.* (emphasis added). In a later news release, the added copper is cited as making the Cu–7 different from inert or hormonal IUDs. *Id.*

These earlier assertions by Searle certainly do not support its current theory the Cu–7 is an inert IUD. Searle cannot now disavow its previous claims due to the passage of the preemptive language in the Amendments. The statement of Administrator Schmidt that the Cu–7 remained at the Bureau of Drugs for administrative convenience only does not counter the literature prepared by Searle itself. Moreover the statement of Administrator Schmidt that § 360k applies to the Cu–7 is not binding on this court as Congress' definitions "must control over contrary statements by administrators." *Graham v. Wyeth Laboratories,* 666 F.Supp. 1483, 1491 (D.Kan. 1987) (citation omitted).

■ Ms. Tarallo has pointed to portions of the record which tend to show the Cu–7 acted "through chemical action" to achieve contraception. *See* 21 U.S.C. § 321(h) (defining device). Furthermore, the copper was apparently included in the IUD to affect the structure of a woman's body so as to prevent pregnancy. *See* 21 U.S.C. § 321(g)(1)(C) (defining drug). Accordingly, as plaintiff has shown a material factual question exists as to the appropriate classification of the Cu–7, summary judgment must be denied.

## II. Preemptive Effect of FDA Drug Regulations

While the Amendments expressly preempt state actions concerning devices, *Stewart,* 672 F.Supp. at 909, the issue of preemption is not expressly addressed in the statutory provisions which govern the approval and sale of drugs. Searle instead argues if the Cu–7 is a drug, this action is preempted because of the pervasive nature of the regulations with which it must comply. The precedent in this circuit forces the court to disagree and therefore summary judgment is denied.

### A. *General Preemption*

There is no express preemptive provision in the Food, Drug and Cosmetic Act of 1938, 21 U.S.C. §§ 301 to 392 (FDCA). *Hurley,* 851 F.2d at 1539. Searle contends preemption should be implied because the Drug Amendments of 1962, Pub.L. No. 87–781, 76 Stat. 780 (the 1962 Act), gave the FDA the exclusive responsibility for evaluating the efficiency and safety of each drug based on the FDA's determination of the need for the product and the general need to ensure that the public has access to beneficial drugs. Thus, after 1962 the FDA became the final arbiter of what drugs would be made available to the American public.

■ The preemption doctrine grows out of the Supremacy Clause of the United States Constitution. U.S. Const. art. VI, cl. 2; *Abbot v. American Cyanamid Co.,* 844 F.2d 1108, 1111 (4th Cir.1988); *Stewart,* 672 F.Supp. at 908. Implied preemption occurs by either of two methods: (1) the federal regulatory scheme is so pervasive as to leave "no room ... for supplementary state regulation", or (2) state law conflicts with federal law making compliance with both either impossible or frustrating to the purpose of the federal mandate. *Abbot,* 844 F.2d at 1111. *See also Hillsborough County, Florida v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985); *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984); *Fidelity Fed. Sav. & Loan Ass'n. v. De La Cuesta,* 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982). Searle primarily relies on the first method of preemption by implication.

■ Despite Congress' statutory enactments, there is a presumption against implied preemption of state laws regarding health and safety issues. *Hillsborough,* 471 U.S. at 715, 105 S.Ct. at 2376. Although federal regulations and statutes are treated similarly for purposes of express preemption, *Stewart,* 672 F.Supp. at 909, preemption based on comprehensiveness alone is less likely to be found in the case of regulations. *Abbot,* 844 F.2d at 1112 (*citing Hillsborough,* 471 U.S. at 717, 105 S.Ct. at 2377). Agencies typically deal with subjects in a more detailed fashion. *Id.*

(*citing Hillsborough* at 718, 105 S.Ct. at 2377). Finally, preemption is less likely if its imposition leaves the plaintiff without available legal means of redress. *Id.* (*citing Silkwood,* 464 U.S. at 251, 104 S.Ct. at 623).

In *Abbot,* the court considered whether an injured plaintiff could maintain an action against the manufacturer of Tri–Immunol, a diptheria-tetanus-pertussis (DTP) vaccine. Based on the above cautionary authorities the *Abbot* court refused to preempt state tort theories based on the regulatory mandates of the FDCA and the Public Health Service Act, 42 U.S.C. §§ 201–300 (PHSA). *Abbot,* 844 F.2d at 1111–12. This conclusion was reached despite the fact the FDA comprehensively regulates drugs and biological products. *Id.* at 1112. These regulations control "the licensing, production, testing, distribution, labeling, review and approval of all drugs and biologicals." *Id.* Furthermore, a manufacturer of DTP must be licensed, its manufacturing process approved and inspected and its personnel FDA qualified. *Id.* Finally the producer must conduct and submit to the FDA the "results of quality assurance tests ... for each batch of vaccine." *Id.* (C.F.R. citations omitted).

The Fifth Circuit has also recognized there is no general preemption to be implied from the pervasive FDCA or PHSA vaccine regulatory scheme. *Hurley,* 851 F.2d at 1539. Likewise, several district courts have similarly ruled. *See Foyle v. Lederle Laboratories,* 674 F.Supp. 530 (E.D.N.C.1987), *petition for permission to pursue interlocutory appeal denied* No. 87–8119 (4th Cir. May 18, 1988); *Scholl v.* *Lederle Laboratories,* 684 F.Supp. 246 (D.Ariz.1987); *Morris v. Parke, Davis & Co.,* 667 F.Supp. 1332 (C.D.Cal.1987); *MacGillivray v. Lederle Laboratories,* 667 F.Supp. 743 (D.N.M.1987); *Graham,* 666 F.Supp. at 1483; *Wack v. Lederle Laboratories,* 666 F.Supp. 123 (N.D.Ohio 1987); *Patten v. Lederle Laboratories,* 655 F.Supp. 745 (D.Utah 1987).

■ The current regulations governing the marketing of IUDs are also detailed. *See* 21 C.F.R. § 310.502 (1988). The manufacturer of a drug IUD must provide extensive information to the purchasers of the product.[2] It must provide a written document which includes among other topics a description of the product, its mode of action or principles of design, any warnings, precautions or adverse reactions associated with the IUD and directions for its use. The material must also include a patient information section. 21 C.F.R. § 310.502. In addition, approval as a new drug required the submission of extensive data reflecting research and drug composition. 21 U.S.C. § 355. Searle argues these detailed instructions preclude any action concerning the adequacy of warnings, testing or design as long as Searle complied with the statute and regulations.

■ The FDCA and PHSA provisions governing the DTP vaccine are at least as comprehensive (and probably more extensive) as the regulations which control the manufacture and sale of drug IUDs. Following *Abbot,* it cannot be implied from the IUD statutory scheme that Congress intended to preempt all state actions which may impose requirements different from or

---

**2.** As all IUDs must be purchased and fitted by a physician, the labeling requirements are directed to the doctor. 21 C.F.R. 310.502(b)(1). Thus the warnings in question here are those given to the physician, not any communicated directly by Searle to Ms. Tarallo. A patient brochure is required to be supplied by Searle to the doctor/purchaser. *Id.* Of course, Searle has no control over whether the patient ever actually receives the booklet. Based on this regulatory scheme, Searle previously moved for summary judgment under the learned intermediary doctrine. The motion was denied by the court by order dated March 22, 1988. The learned intermediary defense rests on the sufficiency and clarity of warnings given to the trained, licensed physician. If the doctor receives a warning which fully comports with the FDA legal standards, the doctrine prevents recovery by a treated patient against the manufacturer. *Brooks v. Medtronic, Inc.,* 750 F.2d 1227, 1231 (4th Cir. 1984). This shifting of the duty to warn is generally referred to as the learned intermediary doctrine because "the physician is called on to act as a 'learned intermediary' between the manufacturer and the consumer." *Id.* at 1231. *See also Beyette v. Ortho Pharmaceuticals Corp.,* 823 F.2d 990 (6th Cir.1987) (discussing doctrine in the context of an IUD action).

in addition to the mandatory drug provisions. Therefore Ms. Tarallo's claims are not barred by the doctrine of general preemption.

## B. *Specific Preemption*

■ Searle relies on dicta in *Hurley* to support its argument that if Ms. Tarallo's action is not generally preempted, it is at least specifically preempted. 851 F.2d at 1542. It contends the questions of adequacy of warning and appropriateness of design can be specifically preempted because of the above FDA requirements. *See* letter of counsel to the court (September 16, 1988). Any requirement imposed by a state (such as a jury) would interfere with the FDA's authority in setting labeling standards. *Hurley,* 851 F.2d at 1542. As long as the FDA has all relevant and obtainable information so as to adequately dictate a proper warning," its decision as to the proper wording must preempt by implication that of a state." *Id.* Under this theory recovery would exist only if Ms. Tarallo showed Searle failed to provide the FDA "all necessary and available information on which to base the warning" and upon which the approval was granted. *Id.* at 1542–43 n. 4. Ms. Tarallo has made no allegation of that type in her complaint.

Searle's argument and reliance on the *Hurley* dicta are not persuasive here. This circuit has not addressed the question of implied specific preemption and this court declines to create that defense. Based on *Abbot,* the court is doubtful the Fourth Circuit would follow *Hurley* and broadly hold a claim not preempted only to then find specific portions of that claim largely barred by the same doctrine. At this stage the court will not follow *Hurley.* Accordingly summary judgment is hereby denied.

## III.  Commerce Clause

■ Searle's final argument is based on the Commerce Clause of the United States Constitution which forbids a state from "impos[ing] a burden ... materially affect[ing] interstate commerce in an area where uniformity of regulation is necessary." *Huron Portland Cement Co. v. City of Detroit,* 362 U.S. 440, 444, 80 S.Ct.

813, 816, 4 L.Ed.2d 852 (1960); U.S. Const. art. I. § 8, cl. 3. According to Searle, the imposition of various state requirements would unduly burden the manufacturer of a nationally distributed product which fully complies with FDA mandates.

Searle's contention is premised on a finding the Cu–7 is a device within the Amendments and its authorities are so directed. Such a finding would require the court to conclude Ms. Tarallo's claims are preempted. To hold otherwise would contemplate a violation of the Commerce Clause in light of Congress' express preemptive intent. 21 U.S.C. § 360k; *Stewart,* 672 F.Supp. at 909.

However, as this court has denied summary judgment on the question of whether the Cu–7 is a drug or a device, judgment cannot be entered for Searle on this constitutional question. If Congress has neither impliedly nor expressly preempted a cause of action, then by allowing actions based on state law it has determined uniformity is not paramount. To allow state law claims to go forward would not burden interstate commerce because Congress has not deemed the agency regulations the controlling standards. The Commerce Clause issue is thus bottomed on the resolution of the drug/device query. Searle's motion is denied on this theory as well.

## CONCLUSION

Ms. Tarallo has brought forth sufficient evidence under Rule 56 to withstand Searle's motion for summary judgment. There are genuine issues of material fact on the question of whether the Cu–7 has been reclassified as a device under the Amendments' transitional language. This point being undecided Searle's contentions of preemption and conflict with the Commerce Clause are not deserving of judgment as a matter of law. Searle's motion for summary judgment is therefore denied and this matter will proceed to trial.

IT IS SO ORDERED.